CASE NO. 25-11493-C

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## USI INSURANCE SERVICES, LLC,

**Appellant,**

v.

## MATTHEW SIMMONS, JACK MITCHELL, and
## SOUTHEAST SERIES OF LOCKTON COMPANIES, LLC,

**Appellees.**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE NO. 8:23-cv-00201-TPB-AAS
HONORABLE THOMAS P. BARBER**

---

## APPELLANT'S OPENING BRIEF

---

**HOLLAND & KNIGHT LLP**
Christopher N. Bellows
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Tel: (305) 374-8500
christopher.bellows@hklaw.com

**HOLLAND & KNIGHT LLP**
Matthew Zimmerman
777 South Flagler Dr., Suite 1900-West
West Palm Beach, Florida 33401-6148
Tel: (561) 833-2000
matthew.zimmerman@hklaw.com

**HOLLAND & KNIGHT LLP**
David E. Cannella
Kristin N. Royal
200 South Orange Ave., Suite 2600
Orlando, Florida 32801
Tel: (407) 244-1165
david.cannella@hklaw.com

*Counsel for Appellant*

Case No. 25-11493-C      *USI Insurance Services LLC v. Matthew Simmons, et al..*

## <u>CERTIFICATE OF INTERESTED PERSONS AND<br>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure, and Rules 26.1-1 and 26.1-2 of the Rules of the United States Court of Appeals for the Eleventh Circuit, undersigned counsel for Appellant give notice of the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal:

Adler, Daniel R., *Pro hac vice* counsel Defendants

Banks, Christopher J., *Pro hac vice* counsel Defendants

Bellows, Christopher N., Counsel for Defendants/Counter-Plaintiff

Brown, Gregory P., Counsel for Plaintiffs

Cannella, David E., Counsel for Defendants/Counter-Plaintiff

Carter, Emily, Plaintiff

Crowell & Moring LLP, *Pro hac vice* counsel Defendants

Gelormino Law, P.A., Counsel for Plaintiffs

Gelormino, Nicola, Counsel for Plaintiffs

Gibson, Dunn & Crutcher LLP, *Pro hac vice* counsel Defendants

Goldman, Lauren, *Pro hac vice* counsel Defendants

Gough, Robert B. III, Counsel for Plaintiffs

Herskowitz Shapiro, PLLC, Counsel for Plaintiffs/Counter-Defendants

Hill Ward Henderson, P.A., Counsel for Plaintiffs

Holland & Knight LLP, Counsel for Defendants/Counter-Plaintiff

Jones, Molly A., *Pro hac vice* counsel Defendants

KKR & CO. L.P., publicly traded company owning more than 10% of
      Defendant USI Advantage Corp.)

Lieffort, Madison, Plaintiff

Mitchell, Jack, Plaintiff/Counter-Defendant

Murray, Sheila, Plaintiff

Rodriguez, Jackie, Plaintiff

Royal, Kristin N., Counsel for Defendants/Counter-Plaintiff

Shapiro, Lyle E., Counsel for Plaintiffs/Counter-Defendants

Simmons, Matthew, Plaintiff/Counter-Defendant

Southeast Series of Lockton Companies, LLC, Counter-Defendant

USI Advantage Corp., Nominal Defendant

USI Advantage Corp., sole parent of USI Guarantor, Inc.

USI Insurance Services, LLC – Appellant & Defendant/Counter-Plaintiff

USI, Guarantor, Inc., sole owner of USI, Inc.

USI, Inc. (Appellant & Defendant/Counter-Plaintiff USI Insurance Services,
      LLC is a wholly-owned subsidiary of USI, Inc.)

Zimmerman, Matthew, Counsel for Defendants/Counter-Plaintiff

## CORPORATE DISCLOSURE STATEMENT

Counsel for Appellant certifies that no publicly traded company or business entity apart from that listed above has an interest in the outcome of this case or appeal.

*/s/ Christopher Bellows*
Christopher N. Bellows

C-2 of 2

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant requests oral argument and asserts that the decisional process will be significantly aided by oral argument. The legal issues material to this case are multi-faceted and overlapping, and their nuances and effects are difficult to fully convey in writing. Oral argument will allow the Court to secure clarification on the details, if necessary, and provide a valuable opportunity to facilitate the Court's understanding of the complex background and legal principles at stake.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND

CORPORATE DISCLOSURE STATEMENT ......................................................C-1

CORPORATE DISCLOSURE STATEMENT ....................................................C-2

STATEMENT REGARDING ORAL ARGUMENT .................................................i

TABLE OF CITATIONS ........................................................................................iv

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUES..............................................................................4

STATEMENT OF THE CASE..................................................................................6

A.    The Insurance Brokerage Industry ..............................................................6

B.    Acquisitions in the Insurance Brokerage Industry ......................................9

C.    Lockton's Growth Strategy: "New Ventures" Instead of Acquisitions.........10

D.    Lockton's "Project Buccaneer": Targeting Simmons and Support Team
       at USI ........................................................................................................13

       1.    Simmons' and Mitchell's Contractual Obligations to USI.................14

       2.    Lockton's Recruitment of Simmons and Mitchell.............................16

       3.    Recruitment of Simmons's Support Team..........................................19

       4.    Lockton's Inflated Incentives to and Protections for the
             Departing Employees .........................................................................21

       5.    Lockton Treated Project Buccaneer as an Acquisition of USI's
             Business...............................................................................................23

       6.    Solicitation of USI Clients While Still Employed by USI.................26

       7.    Mass Resignations and Theft of USI's Business ...............................28

8.    Chaos After the Mass Resignation ...................................32

9.    Lockton Directs Unlawful Service.....................................34

10.   The Value of the Business Stolen by Lockton ...................35

E.   The Litigation ..........................................................................36

1.    Complaint and Counterclaim ............................................36

2.    The Preliminary Injunction ...............................................37

3.    Motions for Summary Judgment........................................39

4.    Rulings Related to Punitive Damages................................41

5.    Jury's Verdict ....................................................................42

F.   USI's Motion for New Damages Trial .........................................43

SUMMARY OF THE ARGUMENT .....................................................44

ARGUMENT ........................................................................................45

The District Court Erred in Prohibiting USI from Seeking the Fair Valuation
of What was Stolen as its Damages.................................................45

The District Court Erred in Refusing to Allow the Jury to Determine the Issue
of Punitive Damages.......................................................................54

CONCLUSION .....................................................................................57

CERTIFICATE OF COMPLIANCE.......................................................58

CERTIFICATE OF SERVICE ...............................................................59

iii

## <u>TABLE OF CITATIONS</u>

**CASES**                                                                                      **Page**

*A.A. Profiles, Inc. v. City of Fort Lauderdale*,
    253 F.3d 576 (11th Cir. 2001) ........................................................45

*ADT LLC v. Alder Holdings, LLC*,
    No. 9:17-CV-81237-ROSENBERG,
    2019 WL 13211550 (S.D. Fla. Apr. 29, 2019)...........................................56

*Azar v. Lehigh Corp.*,
    364 So. 2d 860 (Fla. Dist. Ct. App.1978).........................................56

*Bailey v. St. Louis*,
    196 So. 3d 375 (Fla. Dist. Ct. App. 2016) (*Bailey I*) ........................ 47-53, 55

*Bailey v. St. Louis*,
    268 So. 3d 197 (Fla. Dist. Ct. App. 2018) (*Bailey II*) ...................... 47-53, 55

*Bluesky Greenland Environmental Solutions, LLC*
    *v. 21st Century Planet Fund, LLC*,
    985 F. Supp. 2d 1356 (S.D. Fla. 2013)...........................................56

*Boeing Co. v. Shipman*,
    411 F.2d 365 (5th Cir. 1969) ........................................................55

*Carter v. City of Miami*,
    870 F.2d 578 (11th Cir. 1989) ...................................................54, 55

*Githler v. Grande*,
    289 So. 3d 533 (Fla. Dist. Ct. App. 2019).........................................52

*Grupo DataFlux v. Atlas Global Grp., L.P.*,
    541 U.S. 567 (2004)....................................................................2

*Guyana Tel. & Tel. Co., Ltd. v. Melbourne Int'l Comms., Ltd.*,
    329 F. 3d 1241 (11th Cir. 2003) ...........................................52, 53, 54

*Hasenfus v. Secord*,
    962 F.2d 1556 (11th Cir. 1992) ...................................................54

## TABLE OF CITATIONS

**CASES**                                                               **Page**

*\*MAK, LLC v. Vuozzo*,
    No. 17-23310-CIV-ALTONAGA,
    2019 WL 13525586 (S.D. Fla. Jan. 14, 2019)................46

*Mfg. Research Corp. v. Greenlee Tool Co.*,
    693 F.2d 1037 (11th Cir. 1982) .......................56

*Mercer Health & Benefits LLC, v. DiGregorio*,
    307 F. Supp. 3d 326 (S.D.N.Y 2018) ................51

*\*Mortellite v. Am. Tower, L.P.*,
    819 So. 2d 928 (Fla. Dist. Ct. App. 2002)................52

*Myzel v. Fields*,
    386 F. 2d 718 (8th Cir. 1967) .......................47

*\*Phillips Chem. Co. v. Morgan*,
    440 So. 2d 1292 (Fla. Dist. Ct. App. 1983)................46, 51

*\*Pidcock v. Sunnyland Am., Inc.*,
    854 F.2d 443 (11th Cir. 1988) ................49-51

*Rensel v. Centra Tech, Inc.*,
    No. 17-24500-CIV-KING,
    2018 WL 4410110 (S.D. Fla. June 14, 2018)................46

*\*Werner Enters., Inc. v. Mendez*,
    362 So. 3d 278 (Fla. Dist. Ct. App. 2023)................55

*Whitten v. Clarke*,
    41 F.4th 1340 (11th Cir. 2022) .......................45

**STATUTES**

Title 28, United States Code, Section 1291 .......................2

Title 28, United States Code, Section 1332(a).......................1

Section 542.335, Florida Statutes .......................36

**TABLE OF CITATIONS**

**OTHER AUTHORITIES**                                                          **Page**

Restatement (Third) of Restitution and Unjust Enrichment ............................ 48, 53

Restatement of Agency (Second) § 313 ................................................................ 46

Restatement of Restitution § 151 ....................................................................... 47

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a). This statute provides for diversity jurisdiction because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. Specifically, Appellant USI Insurance Services, LLC ("USI") is a Delaware limited liability company with its principal place of business in New York. USI's sole member, USI, Inc., is a Delaware corporation with its principal place of business in New York. (Docs. 1, 243).

Appellee, Southeast Series of Lockton Companies, LLC ("Lockton" or "Southeast Series"), is a limited liability company established by Lockton Companies, LLC, a Missouri limited liability company, with its principal place of business in Missouri.[1] The Southeast Series, as well as Lockton Companies, LLC, has a sole corporate member, Lockton Insurance Agency, LLC, a Missouri limited liability company. The sole member of Lockton Insurance Agency, LLC is Lockton Operating Companies, LLC a Missouri limited liability company. The sole member of Lockton Operating Companies, LLC is Lockton Partners, LLC, a Missouri limited liability company. The sole corporate member of Lockton Partners, LLC is LCPM, LLC, a Missouri limited liability company. The sole member of LCPM, LLC is

---

[1] The jurisdictional information set forth herein relies upon Lockton's assertions in the Parties' Joint Motion to Amend. (Doc. 243).

Lockton, Inc., a Missouri corporation with its principal place of business in Missouri. Lockton Partners, LLC's remaining members are individuals who are domiciled in the following states or districts: Kansas, Illinois, Texas, Missouri, Colorado, Connecticut, the District of Columbia, California, Florida, Georgia, Minnesota, Arizona, Virginia, New Jersey, Maryland, North Carolina, Oregon and Maine. The Southeast Series' remaining members are individuals who are domiciled in the following states: Georgia, South Carolina, Florida, North Carolina and Alabama.[2]

Appellees Matthew Simmons and Jack Mitchell are citizens of Florida. Accordingly, there is complete diversity of citizenship, as Appellant is not a citizen of the same state as any Appellee.

The Eleventh Circuit Court of Appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, granting appellate courts jurisdiction over appeals from all final decisions of the district courts. The district court entered its final judgments resolving all claims in favor of USI on September 12, 2024 (Doc. 316) and September 30, 2024 (Doc. 326). USI timely filed its post-trial motion on October 10, 2024. (Doc. 350). The district court entered its Order Denying Post Trial Motions

---

[2]     This statement is true as of the January 2023 filing of the Complaint and Counterclaim below. As of May 1, 2024, the Southeast Series gained two members who are domiciled in New York. (Doc. 243 at 3-4). Those additions do not, however, affect this Court's jurisdiction to decide this case. *See Grupo DataFlux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570 (2004) ("[T]he jurisdiction of the court depends on the state of things at the time of the action brought.").

on March 31, 2025. (Doc. 354). USI timely filed its notice of appeal on April 29, 2025. (Doc. 355).

## STATEMENT OF THE ISSUES

1.  Under Florida law, when a person (Lockton) intentionally causes, or substantially assists, an employee (the Producers) or other agent to violate duties of loyalty to the employer (USI), and/or intentionally interferes with the employee's contractual obligations to the employer, in order to intentionally steal some of the employer's business, that person and the employee/agent are liable in damages for the profit derived by their wrongdoing, calculated by the value of what was stolen; therefore, did the district court err in prohibiting USI from presenting any evidence to the jury (including an expert's calculation) of the value of what was stolen, and limiting USI to a damage model Florida courts have held to be incapable of making the injured party whole?

2.  Under Florida law, when a person (Lockton) intentionally causes, or substantially assists, an employee (the Producers) or other agent to violate duties of loyalty to the employer (USI), and/or intentionally interferes with the employee's contractual obligations to the employer, in order to intentionally steal some of the employer's business, it is, as a matter of law, for the jury to determine whether punitive damages are warranted by clear and convincing evidence; therefore, did the district court err in usurping the

4

function of the jury by finding that clear and convincing evidence did not support a claim for punitive damages and by refusing to charge the jury on USI's claim for punitive damages?

## STATEMENT OF THE CASE

### A.    The Insurance Brokerage Industry

USI and Lockton are competitors in the insurance brokerage industry. (Doc. 297 at 217:17-21[3]). Insurance brokers are a liaison between their clients and insurance carriers. (Doc. 297 at 214:7-20). Specifically, a broker's duty is to analyze the insurance market and match clients with insurance providers and programs that correspond with the client's needs. (Doc. 297 at 215:24-216:3). After coverage is placed, the broker also works with the client and the insurance carriers to manage claims and assess other business risks. *See* (Doc. 297 at 218:9-221:7). Typically, the payment a brokerage receives for services rendered is a commission based on a percentage of the insurance premium payable on the insurance policies purchased by the client customer. (Doc. 297 at 215:12-23).

Brokerages like USI provide services to a large variety of businesses and organizations. (Doc. 297 at 215:24-217:16). "Service teams," which are led by "producers," are often formed to serve particular clients. (Doc. 297 at 218:9-221:7). A producer assumes the lead client-facing role and is responsible for managing the client relationship. *Id.* This includes understanding the business of and advising current clients, in addition to attracting and developing new client opportunities. *Id.*

---

[3]      Unless otherwise noted, pin cites to transcripts refer to the page number noted by the court's file-stamp.

Becoming and continuing as a successful producer requires significant experience, training, and support. *Id.* Accordingly, USI invests substantial resources over a significant time to develop successful producers and to help them develop clients. *Id.* This includes, among other things, mentoring, training, internal expertise, maintaining client information, as well as substantial funding to develop client relationships, all provided in confidence by USI. *Id*; *see, e.g.*, (Doc. 298 at 39:15-40:13, 50:18-25).

A valuable resource provided to producers at USI is a capable service team, often made up of account executives, account managers, underwriters, and technical resource specialists, among others. (Doc. 297 at 219:21-22:17). Like producers, service team members require significant investment by the brokerage to become successful. *See, e.g.,* (Doc. 298 at 200:2–201:11). This includes client-specific knowledge, as well as hands-on experience in handling specific clients and insurance matters and developing relationships and an understanding of a client's insurance needs and preferences. *See, e.g.,* (Doc. 331 at 152:1–15). Service teams are valuable resources to competitors of USI. *See, e.g.*, (Doc. 301 at 149:19–25).

While producers often develop relationships with the clients' upper-level executives and C-Suites, the service team acts as the day-to-day contact point for clients' insurance needs with the client's personnel who handle insurance matters. (Doc. 298 at 34:8-22). It is not uncommon for account executives and managers to

have weekly—or even daily—contact with clients. *Id.* Because of the relationships established between clients and their service team on behalf of the broker, service teams are one of the brokerage's most valuable assets. *Id.* Indeed, for brokers like USI, relationships with customers—including customer goodwill—are the backbone of the business. (Doc. 297 at 218:16-18; Doc. 298 at 34:8-22). Once a relationship with a client is established, it is, absent interference, likely to continue because clients appreciate working with a service team that is familiar with their business, history, and preferences. (Doc. 298 at 34:23-35:12). In the insurance brokerage industry, this concept is referred to as "stickiness." *Id.*

To protect itself from unfair competition and to preserve the value of its investment in its customer relationships, USI requires key employees—like producers and service team members—to sign agreements prohibiting them, for a period of time after their separation from USI, from soliciting fellow USI employees to leave USI, from using or disclosing USI's confidential information, and from soliciting, servicing, or accepting business from USI's clients with whom the employee worked or about whom the employee obtained confidential information. (Doc. 298 at 51:4-56:10). Restrictive covenant agreements, such as USI's, are common in the insurance brokerage industry. (Doc. 298 at 51:18-23). Indeed, Lockton employs similar restrictions. *See, e.g.*, (Doc. 302 at 183:7-184:17).

**B.    Acquisitions in the Insurance Brokerage Industry**

The insurance brokerage industry is highly competitive, with a "war for talent" (i.e., insurance professionals) being waged. (Doc. 301 at 98:2-16). Relatedly, insurance brokerage acquisitions are common, with many of the world's largest insurance brokers commonly engaging in acquisitions in the open market. (Doc. 130-1 at 9:6–19, 12:14–25, 13:1–14:25; Doc. 301 at 227:16–229:3). Acquisition transactions in the insurance brokerage industry have become even more common over the last ten years, as the market has become increasingly competitive. (Doc. 130-1 at 12:14-25; Doc. 167-1 at 21:9-21).

In a fair acquisition on the open market, the business to be acquired is usually valued by applying a multiple to EBITDA, which is a proxy for cash flow, and subtracting debt to arrive at equity value. (Doc. 130-1 at 10:11–24; 11:4–23; Doc. 162-1 at 11-13 (Expert Report of Robin Frost ("Frost Report") at pp. 8-10)). Because of heightened competitiveness in the market, when Lockton took the books of business at issue, valuations applying EBITDA multiples in the range of 12-17 times EBITDA were expected. *Id.*; *see also* (Doc. 130-1 at 10:11-24). This valuation method is predicated on the ongoing relationship value between brokerages and their clients, which, absent interference, are likely to persist and grow year-over-year, and are the cornerstone of any insurance brokerage business. *See* (Doc. 298 at 34:23-

35:12). USI, like most of its competitors in the top ten insurance brokerages, grows, in part, through such acquisitions. (Doc. 130-1 at 9:6–19, 12:14–25, 13:1–14:25).

## C.    Lockton's Growth Strategy: "New Ventures" Instead of Acquisitions

Unlike its competitors, Lockton generally does not rely on open-market acquisitions as part of its growth strategy. In fact, Lockton has not participated in any acquisitions on the open market since at least 2015. (Doc. 167-1 at 20:24–21:8; 23:2–5). Nevertheless, Lockton maintains aggressive growth targets. For instance,

████████████████████████████████████████████████████████████████

██. (Doc. 167-1 at 148:10–149:7). And Lockton has indeed grown. For example, in the 8 years prior to the instant litigation, Lockton ██████████████████████

████ (Doc. 167-1 at 18:14–19:25). Similarly, the number of individuals employed by or affiliated with Lockton has more than tripled. *Id.*

To accomplish this growth, and while deliberately avoiding the fair acquisition model used by most competitors in which it would pay market value for the business it acquires, █████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

10

Lockton has repeatedly deployed its lift-out strategy to poach key teams of insurance professionals and secure millions in new business. ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

Team lift-outs benefit Lockton in many ways. Lockton admits that recruiting qualified employees in the open market is a challenge given the "war for talent" in the insurance industry, and there is a benefit when a producer brings their support team with them to Lockton. (Doc. 301 at 97:25–98:16). Similarly, acquiring a producer with an already established book of business ensures revenue immediately instead of the delay resulting from the nature of the sales cycle when starting from scratch. (Doc. 65-2 at 14:7-20) (Simmons discussing cyclical nature of sales cycle and noting "So, typically, when people get in this business, the first year they write almost nothing.").

In addition to the lift-out at issue in this case, since 2016, Lockton has pursued growth ████████████████████████ displaying the same *modus operandi*, as follows:



████████████████████████████████████████████

███  ████████████

Lockton's lift-out model is not the industry norm. Rather, the majority of the

top ten insurance brokers pursue growth through acquisitions on the open market in

a similar manner to USI. *See* (Doc. 130-1 at 13:1-14:25). ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

## D.  Lockton's "Project Buccaneer": Targeting Simmons and Support Team at USI

In this case, Lockton set its sights on Matthew Simmons, and later Jack

Mitchell, prominent producers (collectively "Producers") in USI's Tampa Office.

Before joining USI (then called WFIS[4]), Simmons, an accountant, had no experience in the insurance brokerage industry. (Doc. 298 at 37:14-23). USI trained and mentored Simmons and recruited for his support many of the employees Simmons later recruited to Lockton. (Doc. 298 at 62:24–66:12). At USI, and with USI's support, Simmons' book of business grew from $0 to $7+ million in annual revenue over the course of eight years. (Doc. 298 at 38:13-41:3; Doc. 327-11). This growth included several USI institutional clients that USI introduced and assigned to Simmons. *See* (Doc. 298 at 44:24-45:3 (discussing clients included in Simmons book of business)). USI also trained and mentored Jack Mitchell. (Doc. 298 at 50:7-25; Doc. 302 at 1357:22–1358:3). In just over two years, Mitchell grew his book from $0 to $1.2 million in annual revenue. (Doc. 298 at 50:7–25; Doc. 300 at 202:16–19).

## 1.    Simmons' and Mitchell's Contractual Obligations to USI

As consideration for their continued employment with USI, Simmons and Mitchell each signed an "Employment Agreement" (collectively the "Agreements") with USI. (Docs. 327-77, 327-14; Doc. 298 at 47:4–56:8 (discussing Docs. 327-77 and 327-14)).

---

[4]    WFIS (or Wells Fargo Insurance Services) was acquired by USI in 2017 in an acquisition on the open market. *See* (Doc. 297 at 215:4-8).

In Section 7 of his Agreement, Simmons agreed that, for a period of two years after termination of employment for any reason, he was (1) not to solicit, recruit, or promote the solicitation or recruitment of any employee of USI for the purpose of encouraging that employee to leave employment with USI (Doc. 327-77 § 7.7); (2) not to solicit, participate in, or promote the solicitation of any USI client, customer, or prospective customer with whom he had material contact or regarding whom they received confidential information ("Restricted Account"), for the purpose of providing competitive products/services; and (3) not to accept insurance business from and/or provide competitive products/services to any client or customer of USI with whom he had material contact or that were clients or customers of USI six (6) months prior to his date of termination. (Doc. 327-77 § 7.6).

In Section 8.2 of his Agreement, Simmons agreed that he could terminate his employment with USI upon giving at least sixty (60) days' written notice to the Company ("Notice Provision"). (Doc. 327-77 § 8.2). Simmons agreed that his resignation would be effective in the date specified in such notice, provided, however, that Section 8.2 of the Simmons Agreement also allowed USI, once the written notice was received, to (a) accept Simmons's termination effective immediately or an earlier day specified by USI, or (b) require Simmons to cease performing any services for the entire sixty (60) day period. (Doc. 327-77 § 8.2).

15

Mitchell's Agreement contained substantially similar provisions to those of Simmons' Agreement. (327-14 §§ 6.6, 6.7, 7.2).

### 2. Lockton's Recruitment of Simmons and Mitchell

Lockton referred to the recruitment of Simmons and Mitchell internally as "Project Buccaneer." (Doc. 301 at 100:14–19). Lockton's efforts to recruit Simmons began in earnest in September 2022, primarily through Fred Zutel, President of Lockton's Florida Property & Casualty Division. (Doc. 327-1 at 1; Doc. 300 at 169:4–17; 171:9–13; 172:6–13). Thereafter, Simmons and Zutel remained in near constant contact, engaging in numerous calls, texts and meetings. (Doc. 300 at 173:12–23; Doc. 327-1, *generally*). Zutel boasted about his success at Lockton—sending Simmons numerous pictures of costly watches, cars, and boats—all as further incentive to join Lockton. (Doc. 299 at 30:1–13). Another of Zutel's roles was to determine details regarding Simmons's compensation and the clients that he was assigned at USI. (Doc. 300 at 177:2–10).

Zutel, who was himself the target of a prior Lockton lift-out from Willis, used his experience of being a defendant in a related breach of restrictive covenant lawsuit to assuage any concerns Simmons had about breaching his USI Agreement. *See* (Doc. 300 at 178:8–179:17; Doc. 299 at 24:19–25:10). Zutel explained to Simmons that his own lawsuit "settled quickly in 40 or 50 days and that – all matters get settled." *Id.* Zutel told Simmons USI would seek to enforce Simmons's Agreement

16

and that "this matter would get resolved one way or the other." (Doc. 300 at 178:8–179:17). Zutel also anticipated some payment to be made to USI for the business that would be taken. *See* (Doc. 65-5 at 49:3–17).

During their conversations, Simmons told Zutel that several members of his USI Service Team, which Simmons' himself branded as the "Simmons Team," were likely to follow him when he left, and Zutel relayed this to other members of Lockton's Executive Committee. (Doc. 298 at 73:23–75:6; Doc. 300 at 181:25–182:23). Simmons and Zutel also discussed Mitchell joining Lockton. (Doc. 300 at 182:24–183:18).

In October 2022, Simmons joined Zutel and Hiram Marrero, Global Growth Officer for Lockton Parent, for a fishing trip in Miami. (Doc. 299 at 28:9–29:11). Simmons also remained in frequent contact with Marrero thereafter. *See* (Doc. 327-74).

On November 2, 2022, Simmons met with members of Lockton's Executive Committee in Atlanta, the first of whom was Doug Hutcherson, Chief Executive Officer of Lockton, and Manoj Sharma, its Chief Operating Officer. (Doc. 299 at 30:14–32:2). Simmons discussed the size of his book of business and the industries he was involved in. (Doc. 299 at 33:3–13).

As early as October 2022, Simmons discussed with Mitchell the potential of leaving USI. (Doc. 299 at 76:10–77:2). Later, Simmons shared that he was

communicating with Zutel. (Doc. 201 at 16:–24). On November 3, 2022, ***the day after Simmons' first meeting with Lockton's Executive Committee***, Mitchell contacted Alec Alfonso, formerly of Lockton, who connected Mitchell with Zutel. (Doc. 65-8 at 7).

On November 9, 2022, Sharma—Lockton's Chief Operating Officer—emailed other members of the Executive Committee to introduce them to Simmons. In his email, Sharma explained that Simmons "is currently with USI and has a $9m+ book of business." (Doc. 327-4). These meetings organized by Sharma took place over the next two weeks, culminating in a series of meetings in Lockton's national headquarters in Kansas City with various members of Lockton's national C-Suite. (Doc. 327-76).

Simmons provided Sharma with his USI Employment Agreement and pay records on November 19, 2022, reflecting that USI had paid Simmons $3+ million in 2022 alone, and began negotiations with Lockton. (Doc. 327-77; Doc. 299 at 39:20-40:7).

After beginning discussions with Lockton in November 2022, Mitchell commenced salary negotiations in early 2023. *See* (Doc. 300 at 242:16-25; Doc. 327-17). On January 5, 2023, Mitchell travelled to Miami for a fishing trip and meetings with Zutel and Marrero. (Doc. 300 at 194:8–195:10).

### 3.    Recruitment of Simmons's Support Team

Lockton also targeted members of Simmons's dedicated service team at USI, as well as technical resource personnel who supported Simmons and other USI producers (collectively "Departing Employees" or the "Simmons Team"). Notably, each of these Departing Employees had employment agreements with USI containing restrictive covenants that were substantially similar to the Producers' (except the Notice provision), all of which Lockton induced them to breach. (Docs. 327-14, 327-57, 327-77, 327-82, 327-149, 327-160, 327-167, 327-168).

By early December 2022, Simmons told Account Executives Jackie Rodriguez and Sheila Murray, key leaders of his service team at USI, that he planned to leave USI to join Lockton. (Doc. 302 at 132:19–133:2). In these conversations, Simmons promoted Lockton's "great resources" and told Rodriguez and Murray that he'd also be discussing Lockton and his departure from USI with the rest of the Simmons Team. *See, e.g.*, (Doc. 302 at 132:10-21).

On December 12, 2022, Sharma directed Lockton's recruitment team to post job openings for an Account Executive and Account Manager on Lockton's website. *See* (Doc. 301 at 70:13–71:16). The ***very next day***, Rodriguez applied for the open Account Executive position on Lockton's website. (Doc. 301 at 75:2–24). Five days later, Murray did the same. (Doc. 327-55). Simmons later discussed Lockton with USI Account Managers Madison Lieffort and Emily Carter. On January 5, 2023,

Simmons invited Carter to meet him for coffee, where he discussed his plan to leave USI and join Lockton, in part because Lockton had the "resources he was looking for." (Doc. 302 at 178:22–179:11). Three days later, on January 8, 2025, Carter applied to Lockton. (Doc. 302 at 179:4–23; Doc. 65-16 at 2). Similarly, on January 4 or 5, 2023, Simmons invited Lieffort to his home. During this meeting he explained he was leaving to join Lockton. (Doc. 302 at 191:22–192:12). A few days later, on January 7, 2023, Lieffort also applied to Lockton. (Doc. 302 at 202:9–17).

Subsequently, Chris Kakish—one of USI's key technical resources who also supported Simmons at USI—applied to Lockton on January 16, 2023, about a week after a conversation at Simmons' home, when Simmons explained that he would be joining Lockton. (Doc. 300 at 47:10–50:1). Theresa Kemp—another one of USI's key technical resources—completed her application on either January 24 or the early morning of January 25, 2023, after Simmons told her on January 24, 2023 that he was departing for Lockton, and after she received a phone call from Lockton CEO Doug Hutcherson and later Sharma, asking her to join Lockton on January 25, 2023. (Doc. 300 at 115:1-4; 151:13-152:7). Not a single one of the Departing Employees applied to any other brokerage except Lockton and they only applied after Simmons touted Lockton. *See, e.g.*, (Doc. 299 at 234:23–235:17).

Lockton either knew or assumed all the Departing Employees had USI Agreements containing similar restrictive covenants. (Doc. 65-6 at 50:25-51:6). To

that end, as part of the recruitment process, Lockton connected Simmons with its attorneys, Lyle Shapiro and Nicola Gelormino, in early December, weeks in advance of presenting Simmons with any offer. (Doc. 299 at 70:17–71:20). Between December 7, 2022 and January 25, 2023, the day of Simmons' resignation from USI, Simmons had at least 32 separate calls with Shapiro. *Compare* (Doc. 327-118) *with* (Doc. 251 (noting attorney phone number)).

Likewise, Lockton connected the other members of the Simmons Team with Attorneys Shapiro and Gelormino before they were given offers. This was Lockton's idea—not that of the Departing Employees. *See, e.g.*, (Doc. 235:21–236:6; Doc. 302:7–15, 181:2–16).

### 4. Lockton's Inflated Incentives to and Protections for the Departing Employees

Lockton knew it needed a "competitive offer" to attract Simmons away from USI, where he was earning substantial compensation. (Doc. 300 at 177:2–10). On December 27, 2022, Simmons received his "Producer Member Term Sheet," reflecting the general terms of his proposed employment with Lockton. (Doc. 327-10). After initial negotiations, Simmons requested higher compensation specifically citing the risk of being sued. (Doc. 327-43). In response, Lockton offered Simmons a guaranteed draw of $1.17 million per year for five years and a signing bonus of $1.5 million—an extraordinary package totaling approximately $2.7 million in 2023 alone, that could only be justified by the substantial USI client revenue Lockton

expected Simmons to bring over in violation of his contractual obligations. (Doc. 327-122; 301 at 134:23–135:24). Simmons received this updated Producer Member Term Sheet on January 17, 2023 (Doc. 65-19 at 15-23), and Mitchell received his on the same day (Doc. 65-20 at 1-8). Both ultimately signed and returned their Term Sheets on January 24, 2023. (Doc. 65-20 at 25, 30; Doc. 65-19 at 33, 35).

Notably, Simmons would not leave USI without assurances that Lockton would handle the lawsuit from USI, which was expected because of the plan to move clients and personnel from USI in breach of his agreement. (Doc. 77 at 8:7–14; Doc. 76 at 174:7–18; Doc. 299 at 145:2–8). Lockton agreed to provide such indemnification. This indemnification was not conditioned on compliance with Simmons' legal obligations to USI, but only on the condition that Simmons *comply with the advice of Lockton's counsel*—in this case, Attorney Shapiro, who represented Lockton and the Departing Employees in the litigation below. (Doc. 301 at 137:15–138:18 (discussing Simmons' Member Agreement, (Doc. 327-122)).

On January 18, 2023, Murray and Rodriguez received offers of employment from Lockton. (Doc. 327-28). On January 20, 2023, Carter and Lieffort received their offers. (Doc. 302 at 183:4–6). Kakish received his offer of employment on January 23, 2023 (Doc. 327-34), and Kemp received her offer on January 25, 2023. Each offer included a significant signing bonus. (Doc. 65-14 at 6; Doc. 65-13 at 6; Doc. 65-16 at 17; Doc. 65-15 at 14; Doc. 65-17 at 4; Doc. 65-18 at 7).

The Departing Employees each signed a Lockton Employment Agreement that contained restrictive covenants substantially similar to those found in their USI Agreements. (327-56 §§ 4-5; Doc. 327-67 §§ 4-5; Doc. 327-72 §§ 4-5; Doc. 327-84 §§ 4-5; Doc. 327-31 §§ 4-5; Doc. 65-13 at 13 §§ 4-5). As for Simmons and Mitchell, their producer Member Agreements with Lockton contain restrictive covenants substantially similar to those in their USI Agreements. (Docs. 327-122, 327-159).

### 5. Lockton Treated Project Buccaneer as an Acquisition of USI's Business

Together Lockton and Lockton Parent evaluated Project Buccaneer as one would a typical acquisition of a business.



This immediate influx of capital in the first year was made even though a producer typically does not generate much business in the first year. (Doc. 65-2 at 14:7-20) (Simmons discussing cyclical nature of sales cycle and noting "So, typically, when people get in this business, the first year they write almost nothing."). Lockton expected that Simmons would bring his USI clients, which supported the significant salary it offered, and was required to make the financial model viable. *See* (Doc. 301 at 151:2–5). The amount of business

that actually moved to Lockton in the first year after Project Buccaneer matched

Lockton's projections almost exactly. ████████████████████████████

█████████████ *with* (Doc. 298 at 93:2–6 (discussing amount of annual revenue

that left USI)).

Notably, USI was not permitted to obtain Lockton's projections for the

ultimate profit it would obtain as a result of Project Buccaneer. Instead, Lockton

claimed attorney client privilege over this information, arguing that the litigation

costs it anticipated and input into the pro forma analysis, prior to any actual or

threatened litigation, constituted privileged advice, and could be reverse engineered

from profit calculations. (Doc. 95 at 11–13). Although USI challenged this assertion,

it was affirmed after *in camera* review. (Docs. 89, 95, 97, 102, 106, 108, 110).[5]

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[5]    The Court made its ruling after in camera review near the close of discovery in this case. The Court denied USI's Motion to conduct additional discovery based on the information that the Court ordered produced after in camera review. (Docs. 131, 151, 143, 153, 171).

[6]    This figure, too, was redacted as privileged information.

████████████████████████████████████

████████████████████████

### 6.    Solicitation of USI Clients While Still Employed by USI

The evidence below established that in the two months prior to his departure from USI, while being guided by Lockton's attorneys, Simmons—in breach of his fiduciary and contractual duties to USI— told at least 27 USI clients, many during in-person meetings, that he would be leaving USI to join Lockton, some as early as December 2022 (more than one month prior to the pre-determined January 25, 2023 theft of USI's business). (Doc. 301 at 180:21-181:4; Doc. 299 at 85:4–110:18; 106:5-110:18). Simmons even expensed many of these client meetings to USI, despite using these meetings as an opportunity to help Lockton steal USI's business, staff, and proprietary information. (327-157).

During these in-person client solicitations, and while still working at USI, Simmons touted Lockton's resources and complained about USI to employees and clients. *See* (Doc. 301 at 183:15-24). Simmons told clients that if they wanted to move, he could connect them with a Lockton representative, and that after they moved they would continue to be serviced by their USI service team, who would be joining Simmons at Lockton. (Doc. 299 at 90:25-91:20; Doc. 327-141 at 12) ("Matt suggested moving the cyber right now and he and his team could take to finish line."); *see also* (Doc. 301 at 186:24-187:16).

For example, in advance of the mass resignation, Simmons discussed his departure from USI with representatives of a Restricted Account in at least two in-person meetings, one of which required travel. (Doc. 299 at 94:10–95:16)(discussing his move to Lockton). During this same period, Simmons requested multiple reimbursements from USI for entertaining that same Restricted Account he and Lockton were conspiring to steal. (Doc. 327-157 at 2).

Similarly, Simmons discussed leaving USI with representatives of two other Restricted Accounts while in Texas in December 2022. (Doc. 299 at 94:10-95:16) (discussing lunch meeting in Texas on December 12, 2022 with representative of Restricted Account); *Id.* (discussing meeting with representative of another Restricted Account during same trip). Simmons also sought reimbursement from USI for this trip. (Doc. 327-157 at 2-3).

Moreover, Simmons—with Lockton's support and direction—used other USI platforms to solicit USI's clients to move to Lockton while still employed at USI. For example, in a particularly egregious solicitation, on January 24, 2023 (the day before the actual takeover), Simmons presented a renewal proposal to a Restricted Account, PGT Innovations, during which Simmons asked Rick Tyson, PGT's Senior Director of Finance, to stay on the call after others dropped off. Simmons then explained to Tyson that he would be resigning from USI to join Lockton the next day. Simmons told Tyson that: a) his "entire team" would be joining Lockton; b)

27

Lockton had a deeper bench of expertise than USI; c) PGT's fee structure would not change at Lockton; and d) if PGT wanted to move to Lockton, it had a "short window" to do so because a court order might be entered preventing PGT from doing so in the future. (Doc. 301 at 181:5-19). Simmons instructed Tyson to contact Manoj Sharma at Lockton to begin the transfer process to Lockton. (Doc. 301 at 185:10-186:16). Again, all of these tortious acts and breaches were directed and financed by Lockton (as the jury would later find).

Mitchell also notified USI clients of his departure prior to his resignation. (Doc. 300 at 221:7-19). For instance, on January 24, 2023, Mitchell notified the principals of Restricted Accounts Susquehanna Holdings and ECA Properties that he was departing USI the next day. *Id.* The morning of January 25, 2023, after arriving at Lockton, Mitchell again affirmatively reached out to these clients to provide Sharma's phone number so that they could begin the transfer process. (Doc. 300 at 218:113). These tortious acts and breaches were also aided and abetted by Lockton (Doc 286).

### 7.    Mass Resignations and Theft of USI's Business

Lockton selected January 25, 2023, as the date that Simmons, Mitchell, and six other USI employees would resign without notice from USI and begin work at Lockton. *See, e.g.,* (Doc. 299 at 236:21–237:11; Doc. 301 at 105:17–20). The day was selected, in part, so Simmons could collect a $1.58 MM retention bonus from

USI on January 20, 2023, five days before his resignation, and months after he was working with Lockton to secure clients and colleagues to move to Lockton. *See* (Doc. 327-156 at 26 (reflecting bonus payment); Doc. 299 at 74:15–25). Lockton dictated that all Departing Employees would leave USI and start at Lockton on the same day, even though some of the Departing Employees applied to Lockton only days or hours before January 25th. (Doc. 301 at 105:17–20).

Indeed, on January 20, 2023, USI paid Simmons a $1.58 MM retention bonus (Simmons would also receive a $1.5 MM signing bonus from Lockton on or about January 25th). (Doc. 301 at 105:17–20; Doc. 327-122). Days later, at 8:00 a.m. on January 25, 2023, Simmons resigned from USI by email "effective immediately" to join Lockton, leaving chaos in his wake. (Doc. 327-12). USI would soon discover that Simmons's departure was just the first of many and had been months in the making. Indeed, Simmons's resignation was followed by that of Mitchell, who emailed his resignation, effective immediately, at 8:17 a.m. on January 25, 2023, to join Lockton. (Doc. 327-15). Between 8:00 and 8:31 A.M. the same morning, five other USI employees, four of whom were on Simmons' dedicated support team, resigned effective immediately to join Lockton. (Docs. 327-29, 327-147, 327-146, 327-148, 327-144).[7] All of the Departing Employees submitted their resignation

---

[7]    A sixth employee, Theresa Kemp, emailed her resignation letter later on January 25, 2023. (Doc. 327-145).

emails in substantially the same form (assisted in drafting by Lockton's attorneys) and began work at Lockton the same morning or later that day. *See, e.g.*, (Doc. 331 at 142:14–143:8; Doc. 299 at 237:12–238:23).

By 9:31 A.M. on January 25, 2023, Simmons, Mitchell, Rodriguez, Murray, Lieffort, and Carter sued USI in state court seeking a declaration that their USI Employment Agreements (applicable to all departing employees) were an unlawful restraint on trade (despite the fact they had signed substantially similar agreements with Lockton just days prior). (Doc. 1-1 at 21–52). This meritless lawsuit was Lockton's idea—not the employees'—and was filed to create further upheaval, chaos, and distraction as USI scrambled to retain its clients. *See, e.g.*, (Doc. 299 at 244:15–25). Notably, the former USI employees (represented by Lockton's attorneys) did not wait even a day for the Court to rule on their action nor attempt to seek any expedited review of their agreements before they began to accept and service the business stolen from USI. *See* (Doc. 301 at 155:3–14).

Indeed, by 9:53 A.M. on January 25, 2023, the CFO of Hit Promotional Products, a Restricted Account, copied Simmons by email at his USI email address, apparently by mistake, acknowledging receipt of a request from Lockton to complete paperwork necessary to move the Hit Promotional Products account from USI to Lockton. (Doc. 9-1 at 5-6).

30

This was representative of the general process by which USI clients were provided contact information for and instructed to reach out to either Sharma or Claudia Mandato (Executive Vice President of Lockton Management (Doc. 300 247:17–25)), who would then give instruction for beginning the transfer process. (Doc. 301 at 95:2–24). Lockton carefully orchestrated the client onboarding process to coincide with the mass resignation. Mandato traveled from Kansas City, Missouri to Tampa on January 24, 2023, to onboard the Departing Employees and facilitate the theft of USI's business by Lockton. *See* (Doc. 300 at 248:8–249:10).

By the afternoon of January 25, 2023—just hours after the Departing Employees resigned from USI—Sharma and Mandato had begun the transfer of 16 Restricted Accounts from USI to Lockton. (Doc. 65-24; Doc. 327-141; Doc. 327-142; Doc. 327-143). Contacts from USI clients continued over the next two days as the coordinated takeover process unfolded. *See id.* Many clients contacted Lockton before the Departing Employees had even posted any announcement or LinkedIn posts about their change of employer, demonstrating that these transfers were pre-arranged rather than client-initiated. (Doc. 300 at 253:1–24).

Lockton knew that the Restricted Accounts that Simmons brought from USI wanted to continue to work with Simmons at Lockton. (Doc. 301 at 156:16–157:14). In order to ensure the business moved, Lockton—via Sharma—assured the Restricted Accounts they would be able to do so once the transfer process was

31

complete (despite knowledge that this would be a violation of Simmons's USI Agreement). *Id.*

Clients were instructed to provide Lockton with information necessary to draft "Broker of Record" letters, which would formalize the change in broker with the insurance carriers and complete the theft of the accounts from USI by Lockton. (Doc. 301 at 95:2–24). In several instances, clients provided Lockton with emails or proposals generated by USI's systems that had been forwarded to them by the Departing Employees just days before their resignation—additional clear evidence of the misappropriation of USI's proprietary information. (Doc. 299 at 115:3–122:23 (discussing (Docs. 327-13, 327-30, 327-143))).

Within three days of the Departing Employees' departure, over 25 Restricted Accounts had terminated their relationship with USI and named Lockton as their broker of record, constituting over $4 million in annual revenue to USI, and a book of business with a value between $15-19 million on the open market. *See* (Doc. 162-1 at 8, 10–11).

### 8.    Chaos After the Mass Resignation

When provided proper notice of a producer's impending departure and given the two-years of "hands-off" non-interference by the departing producer that USI is entitled to under its employment agreements, USI is largely successful in retaining the producer's book of business and support team personnel. (Doc. 298 at 58:5–61:7

284:5–287:7 (discussing examples); Doc. 302 at 61:11–66:1). Indeed, USI uses a producer's 60-day notice period to hand-select an alternate producer and to establish a relationship between the new producer and client. (Doc. 298 at 56:9–58:4, 84:19–85:10; Doc. 302 at 61:14–64:10, 65:4–9). Similarly, when given a chance, USI often offers promotions and/or bonuses to a departing producer's support team to retain these personnel. *Id.*

Here, USI was given no such opportunity, which was by Lockton's design. USI's efforts to retain its accounts were sabotaged. In the hours after the Departing Employees' resignation, chaos ensued. Remaining personnel and management scrambled in attempt "to figure out who was left and who remained behind. Just trying to find out how—what was going on with the clients, trying to get in touch with the clients, trying to get in touch with the service team." (Doc. 302 at 70:9-19). None of the Departing Employees provided any notice, nor did they provide any transition notes or information or respond to any of USI's calls for assistance locating client information. (Doc. 302 at 70:20-25). Further, USI determined that its Customer Relationship Management System ("CRM")—where client contact and sales information should have been stored—was devoid of such information. (Doc. 302 at 71:9-74:1). In some instances, CRM information was entirely missing – in others, it was replaced with aliases, like "Mr. Inconspicuous," that no one remaining at USI would understand. (Doc. 302 at 70:4—77:23). Instead of receiving the fair

33

opportunity to retain its business and employees to which it was entitled, USI was forced to compete with hands tied behind its back—without key client contact information, without account history, and without assistance from the key personnel USI introduced to these clients.

### 9.    Lockton Directs Unlawful Service

Lockton knew it was important for the former USI employees to service the stolen business, given their knowledge of and relationships with the Restricted Accounts. (Doc. 301 at 149:19–25). Accordingly, once the change in broker of record was complete, Lockton assigned the Departing Employees to work on Restricted Accounts in a way that "mirrored the assignments or the clients that they worked [with] while at USI." (Doc. 301 at 153:20–154:20, 155:15–156:8; Doc. 327-101). Lockton also assigned Simmons and Mitchell as producers to those accounts. *Id.* Despite knowledge of the Departing Employees' two-year agreements not to work with the clients, Lockton intended that the Simmons Team would continue to service their former USI clients after the transition. (Doc. 301 at 95:20–96:6; 108:5–19).

After discussions with the Departing Employees, Lockton was "comfortable" with stealing business from USI and allowing the Departing Employees to service USI's clients without waiting for a determination by the Court regarding the enforceability of the USI Employment Agreements. *See* (Doc. 301 at 155:3–14).

34

Similarly, Lockton was "comfortable" in allowing Mitchell and Simmons to start at Lockton without abiding by the Notice Period in their USI Agreements (even though similar notice is also required in Lockton Agreements). See (Doc. 301 at 163:12–164:22).

### 10.    The Value of the Business Stolen by Lockton

USI's expert witness, Chartered Accountant Robin Frost—who has advised on both the buyer- and seller-side of over 100 acquisitions in the insurance brokerage industry (Doc. 301 at 226:25–229:11)—opined that, by employing EBITDA multiples of 10-12 (a conservative multiple according to industry experts), the value of the business obtained by Lockton through Project Buccaneer was in the range of $15,784,080-$18,940,896. (Doc. 162-1 at 7–11; Doc. 162-2[8] at 60:4–22 (describing calculations as valuing accounts taken by Lockton)). This was according to Frost's analysis of the "fair market value" of the business stolen from USI, or what Lockton would have been required to pay USI for the book of business in a fair acquisition on the open market. Frost, an industry expert, opined that the value of the book of business taken by Lockton was more accurately reflected by this fair market valuation (as opposed to lost profits analysis). (Doc. 162-2 at 66:8–20 ("So, you

---

[8]    Pages cited from the deposition transcript of Robin Frost reference the page numbers assigned by the Court Reporter.

know, USI had these accounts. They have a value. And in a fair market transaction, this would be an appropriate range for what they're worth").

## E.    The Litigation

### 1.    Complaint and Counterclaim

Just an hour after their resignation, Simmons, Mitchell, and service team members Murray, Rodriguez, Carter, and Lieffort filed a Complaint in the Thirteenth Judicial Circuit of Florida, alleging one count for a declaratory judgment against USI (the "Declaratory Action"). (Doc. 1-1). The Declaratory Action was Lockton's idea, financed by Lockton, and filed by attorneys being paid by Lockton. The Declaratory Action Plaintiffs sought to invalidate their USI Agreements as overly broad and unenforceable under § 542.335, Fla. Stat. *Id.* at 43. Again, the USI Agreements they sought to invalidate were substantially the same as the agreements Plaintiffs signed with Lockton (some just the day before filing the Declaratory Action).

In response, USI removed the Declaratory Action to the United States District Court for the Middle District of Florida, and filed a Counterclaim against Simmons, Mitchell and Lockton. (Docs. 2 and 3). The Counterclaim against the Producers alleged breaches of the restrictive covenants in the Producers' USI Agreements pursuant to Fla. Stat. § 542.335, and breaches of the Producers' fiduciary duties to USI.  As to Lockton, USI brought claims for tortious interference and aiding and abetting breach of fiduciary duty.

36

### 2. The Preliminary Injunction

On January 30, 2024, USI filed a Motion for Preliminary Injunction to enjoin the Producers and Lockton from further unlawful acts. (Doc. 9). On February 15, 2023, the Court entered an Order finding the USI Agreements enforceable and enjoining any violations of the Simmons and Mitchell USI Agreements (the "Injunction Order"). (Doc. 31). Specifically, the Injunction Order required that Simmons and Mitchell comply with their restrictive covenants and prohibited them from, among other things, soliciting, servicing, or accepting business from Restricted Accounts. *Id*. at 10-11. This included Restricted Accounts that had already moved to Lockton as a result of Lockton and the Producers' bad acts. Id. And, because the Court found that Murray, Rodriguez, Lieffort, and Carter were acting in concert with the Producers, they too were enjoined along with the Producers. *Id.*

After the Injunction Order was entered, the Parties engaged in expedited discovery and an evidentiary hearing was held on April 12-13, 2023. (Doc. 57). Through expedited discovery, USI determined that, although Lockton had removed Simmons, Mitchell, Rodriguez, Murray, Lieffort, and Carter from servicing the Restricted Accounts, Lockton had identified what it believed to be a loophole within the Injunction Order to continue its use of former USI personnel to service the stolen USI accounts. *See* (Doc. 65-25 (composite exhibit of emails to Restricted Accounts

listing Kakish and Kemp on "Core Service Team")). Specifically, Lockton assigned Chris Kakish to manage the Restricted Accounts, often assisted by Theresa Kemp as a technical resource. *Id.*

On May 9, 2023, after an evidentiary hearing and supplemental briefing, the Court entered an Amended Injunction Order, which affirmed the Injunction Order and expanded the relief awarded to USI to include Kakish and Kemp. (Doc. 73). This injunction remained in place until a permanent injunction was entered after trial. At this point, however, the steal had already occurred, just as Lockton planned.

Despite the injunction, the Restricted Accounts were not assigned to another producer during the litigation. Instead, they were coded as "house accounts" for accounting purposes and held for the benefit of Simmons and Mitchell, who were to receive the benefit of the historical commissions (from 2023 and 2024) related to the Restricted Accounts once they were reassigned. (Doc. 301 at 96:7–21).

By October 2023, Lockton had already obtained the benefit of over $3 million in revenue in connection with the Restricted Accounts since January 25, 2023 and expected additional revenues. (Doc. 327-114) (describing revenue associated with Restricted Accounts as of October 31, 2023).

### 3.  Motions for Summary Judgment

#### a.  USI's Motion for Partial Summary Judgment as to Breach

On November 30, 2023, USI moved for final summary judgment as to the Declaratory Judgment Complaint and for partial summary judgment as to its breach of contract claims against Simmons and Mitchell. (Doc. 126). On March 6, 2024, the Court entered an Endorsed Order granting USI's Motion for Summary Judgment as to the Declaratory Judgment Complaint and granting in part USI's Motion for Summary Judgment as to its breach of contract claims against Simmons and Mitchell. (Doc. 181). Specifically, the Court reaffirmed its prior ruling that the USI Agreements were valid and enforceable and found that Simmons and Mitchell had breached their USI Agreements by failing to provide notice and by taking actions that "at least indirectly solicited, induced, or diverted, clients, accounts, and employees away from USI." *Id.*

On June 18, 2024, the Court entered a Supplemental Order Granting in Part and Denying in Part USI's Motion for Summary Judgment. (Doc. 226). Specifically, the Court held that Simmons breached his USI Agreement by: 1) failing to provide the required 60-day notice; 2) notifying at least 27 clients regarding his impending departure; and 3) at least indirectly soliciting other USI employees, including Sheila Murray, Jackie Rodriguez, and Emily Carter. *Id.* at 5-8. Similarly, the Court held that Mitchell breached his USI Agreement by: 1) failing to provide the required 60-

day notice; and 2) notifying two clients regarding his impending departure. *Id.* The issues of whether Simmons' and Mitchell's breaches caused damage to USI, and, the amount of damages, if any, were reserved for jury trial. *Id.* at 11.

### b.  USI's Motion for Partial Summary Judgment as to Fair Market Damages

Upon invitation by the Court to file a second motion for summary judgment on the issue of damages, on November 30, 2023, USI filed such a motion, requesting a ruling that the fair market valuation developed by expert witness Robin Frost was an appropriate measure of damages in this case, as Lockton's coordinated hiring of USI employees and transfer of USI clients constituted a "forced sale" warranting compensation at insurance brokerage industry acquisition rates (using EBITDA multiples of 10-12). (Doc. 130[9]). Relatedly, Appellees moved to exclude the fair market valuation, contending that under Florida law, fair market value damages are only appropriate when a business is completely destroyed. (Doc. 128[10]). On March 5, 2024, the Court denied USI's Motion and granted in part Appellees' Motion, holding that the fair market valuation was legally unavailable because it impermissibly included the value of Simmons and Mitchell as producers. (Doc. 178).

---

[9]     Unredacted versions of the pleadings and exhibits filed at (Doc. 130) were ultimately filed at (Doc. 167). An unredacted version of the Opposition to USI's Motion was filed at (Doc. 165).

[10]     Unredacted versions of the pleadings and exhibits filed at (Doc. 128) were ultimately filed at (Doc. 162).

### 4.    Rulings Related to Punitive Damages

USI sought punitive damages against Appellees based on its claims of tortious interference, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty in light of the intentional wrongful conduct at issue.

As it relates to punitive damages for Lockton's tortious conduct, notably, the trial court significantly narrowed USI's tortious interference claim, limiting the predicate act for which Lockton could be liable to assigning the Producers to service the Restricted Accounts after they moved to Lockton and before they were enjoined. (Doc. 225 at 10).[11]

Similarly, the Court prohibited USI from presenting evidence that was crucial to its punitive damages claim. Specifically, Appellees moved to exclude evidence—namely testimony of Sharma, Lockton's COO— ███████████████

████████████████████████████████████

███████████ ("Lift Out Evidence"). (Doc. 177).

Although the Court deferred ruling at the motion in limine stage, it ultimately prohibited USI from presenting the overwhelming majority of the Lift Out Evidence when it ruled on USI's designations of testimony for trial from the November 2023

---

[11]    USI sought reconsideration of this limitation after additional evidence was submitted at trial. (Doc. 303 at 216:11-220:3).

deposition of Manoj Sharma ("Sharma Designations").[12] *See* Doc. 264 (order on USI's proposed Sharma Designations filed at (Doc. 313)); *see also* (Doc. 301 at 16:7–19:17).

During the trial, on July 16, 2024, Lockton and the Producers filed a Motion for Judgment as a Matter of Law arguing that USI was not entitled to punitive damages as a matter of law. (Doc. 271). USI filed its Response on July 17, 2024. (Doc. 274). The Court granted the Motion in part, noting in discussion that it had not "heard anything that rises to that level. And if I did, it wouldn't be anywhere near clear and convincing, which is what the jury would need to actually come back in your favor on that." (Doc. 291; Doc. 303 at 234:17-242:15).

### 5.    Jury's Verdict

Despite the fact that USI's evidence and presentation on damages were significantly limited by the Court, the Jury—after deliberating for only an afternoon—found in favor of USI on *all counts* against Appellees. Specifically, the Jury found Simmons liable for breach of contract and breach of fiduciary duty and

---

[12]    Defendants asserted confidentiality over portions of the Sharma Designations. Accordingly, USI filed a placeholder for the Sharma Designations at Doc. 259, and, upon the Court's request, emailed unredacted designations to the Court on July 13, 2024. The Court ruled on the Sharma Designations at Doc. 264. After trial, the Court granted Defendants' motion to seal the Sharma Designations at Doc. 289. *See* (Docs. 312, 313). Unredacted versions of USI's Sharma Designations were ultimately filed at (Doc. 313). The Sharma Designations at issue included (Doc. 313 at 67:13—21, 67:24—68:1, 68:4, 68:18—20, 68:23, 69:9—19, 69:22—70:4, 70:7, 71:5—8, 71:10, 72:18—21, 72:24-25, 73:1—8, 73:11).

awarded damages to USI in the amount of $1,982,500. (Doc. 284). The Jury also found Mitchell liable for breach of contract and breach of fiduciary duty and awarded damages to USI in the amount of $152,500. (Doc. 285). The jury found Lockton liable for tortious interference and aiding and abetting breach of fiduciary duty and awarded damages in the amount of $915,000.00 (Doc. 286).

### F.    USI's Motion for New Damages Trial

On October 10, 2024, USI filed its Motion for New Trial on Damages and to Amend the Judgment to Disgorge Lockton's Gains. (Doc. 334[13]). Therein, USI argued that it was entitled to a new trial so that the jury could be charged on punitive damages, and so that the jury could hear evidence regarding USI's fair market valuation model.[14] The Court denied USI's Motion as to punitive damages on the basis that, "[g]iven the uncertainties as to how far businesses in Lockton's position may go without stepping over the line from permissible to tortious conduct . . ." the Court "believes it correctly declined to submit the issue of punitive damages to the jury." (Doc. 354 at 20). Similarly, the Cout denied USI's Motion as to fair market

---

[13]    An unredacted version of USI's Motion was ultimately filed at (Doc. 350).

[14]    Alternatively, USI sought an amendment of the judgment to include disgorgement of Lockton and the Producers' unlawful gain (i.e., the value of the accounts stolen). (Doc. 334 at 20).

damages on the basis that "the market value of the book of business incorporates the value of [the Producers'] expertise, relationships, and future services." *Id.* at 21.

## SUMMARY OF THE ARGUMENT

The district court erred in refusing to allow USI to introduce evidence of the value of the property stolen by Appellees as a measure of damages. Under Florida law, USI—having been injured by tortious interference and breaches of fiduciary duties (including Lockton's aiding and abetting those breaches)—was entitled to have its damages measured by the value of the property converted by the wrongdoers. The fact that the value might include the skills of the Producers is immaterial according to recent decisions of the Florida courts. Having refused to allow USI to present the damage model approved and required under Florida law, USI was forced into a damage model that has been rejected by Florida courts as insufficient to cure the wrongdoing, and which did not come close to restoring the value of what was stolen. The incorrect damage model also allowed the wrongdoers to present counter-evidence seeking to diminish USI's damages based on a hypothetical inability to keep the business that was stolen. But damages are not measured by the value of what business USI might have salvaged; instead damages are measured by the value of what the wrongdoers gained (or should have paid) at USI's expense. A new trial on damages is required.

44

The district court also erred by not allowing the jury to determine the issue of punitive damages. Florida courts have consistently held that where a party schemes with a competitor's employees to steal the competitor's business, staff, and proprietary information—as happened here—the issue of punitive damages must be considered by the fact-finder (here, the jury). By taking that issue away from the jury, the district court erred as a matter of law. On retrial, the jury must be allowed to consider punitive damages as to the wrongdoers: Lockton and the Producers.

## ARGUMENT

### The District Court Erred in Prohibiting USI from Seeking the Fair Valuation of What was Stolen as its Damages

A district court's ruling on the proper legal standard to compute damages is reviewed *de novo*. *A.A. Profiles, Inc. v. City of Fort Lauderdale*, 253 F.3d 576, 581 (11th Cir. 2001). And although a district court's ruling on the admissibility of expert testimony is usually reviewed for an abuse of discretion, *id.*, the district court's exclusion of expert testimony below was based on legal error as to USI's proposed damage methodology. Legal error is reviewed *de novo*. *Whitten v. Clarke*, 41 F.4th 1340, 1347-48 (11th Cir. 2022).

Under Florida law, where a third party (Lockton) colludes with employees (the Producers) to steal from their employer, the third party and the employees are liable to the employer for the value of the property stolen. In other words, according to Florida law, a fair valuation damage model will properly restore to the victim in

damages the value of what the wrongdoer gained (or should have paid). *Phillips Chem. Co. v. Morgan*, 440 So. 2d 1292, 1294-96 (Fla. Dist. Ct. App. 1983) (Florda law will not permit wrongdoers, such as those in this case, to "retain the fruits of their obvious wrong"; and "A person who intentionally causes a servant or other agent to violate a duty to the principal is subject to liability in tort" for the profit derived by the wrongdoing, calculated by the value of what was stolen minus the price received) (citing the Restatement of Agency (Second) § 313); *see also MAK, LLC v. Vuozzo*, No. 17-23310-CIV-ALTONAGA, 2019 WL 13525586, at *11 (S.D. Fla. Jan. 14, 2019) (applying Florida law; "Another potential remedy for breach of fiduciary duty includes the value of the principal's property converted by the fiduciary") (citation omitted); *Rensel v. Centra Tech, Inc.*, No. 17-24500-CIV-KING, 2018 WL 4410110, at *8 n. 13 (S.D. Fla. June 14, 2018) (cited in *MAK, LLC v. Vuozzo*; "There are authorities that suggest that, in cases of fraud or breach of fiduciary duty, that the court may adopt an alternate measure of damages more akin to restitution . . . .  Where a person is entitled to a money judgment against another because [of] consciously tortious conduct the other has acquired, retained or disposed of his property, the measure of recovery for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition, or a higher value if this is required to avoid injustice where the property has fluctuated in value or additions have been made to it.") (internal citation and

quotation marks omitted) (citing Restatement of Restitution § 151 and *Myzel v. Fields*, 386 F. 2d 718, 743 (8th Cir. 1967)).

According to USI's expert, the value of the property stolen by Lockton and the Producers was between $15-$19 million. Per industry standards, this is the true value of what Lockton and the Producers gained from their intentional wrongdoing. Although Florida law clearly allowed USI to recover the value of the business stolen, the district court (a) refused to allow that remedy; and (b) prohibited USI's expert from testifying as to the value gained by the steal.

This was error. Under Florida law USI was entitled to the value of what was converted by the wrongdoers ($15-19 million) minus the price received (zero). This value represented what the wrongdoers stole and was the appropriate remedy for the victim. This can also be viewed as the wrongdoers' gain, which is likewise recoverable by the victim as damages.

Directly on point are *Bailey v. St. Louis*, 196 So. 3d 375 (Fla. Dist. Ct. App. 2016) (*Bailey I*); and *Bailey v. St. Louis*, 268 So. 3d 197 (Fla. Dist. Ct. App. 2018) (*Bailey II*). In *Bailey II*, the appellate court concluded that the defendants stole the plaintiffs' business model, along with their key employees, "and everything else." *Bailey II*, 268 So. 2d at 202. The appellate court reversed the trial court's damages award and instructed that the defendants were required to disgorge to the plaintiffs the value of their entire business plus additional profits from the theft. *Bailey II*, 268

So. 3d at 199-203 (citing Restatement (Third) of Restitution and Unjust Enrichment § 3; reversing the trial court and remanding with instructions to award the plaintiff the value of the defendants' business ($264 million) plus additional monies and profits the wrongdoers received as a result of the theft).

Here, the district court ruled that *Bailey* did not apply because the *Bailey* rule measured damages by what the wrongdoer gained. But that is exactly what USI's fair valuation model intended to do—show the jury the value of what Lockton and the Producers stole (gained) from USI. This is the exact damage model approved by the Florida courts; thus, it was error for the court to strike it from the case. In fact in *Bailey*, the plaintiff was entitled to the value of the business allegedly stolen **plus** additional profits gained by the wrongdoers. *Bailey II*, 268 So. 3d at 199-203. Those extra gains should also be on the table on remand for a new trial on damages.

The district court also rejected the *Bailey* rule because the value gained by the wrongdoers would include the value attributed to Simmons and Mitchell who "were not prevented by their agreements or any fiduciary duty from moving to Lockton or from competing with USI after the move." But they **were prevented** by their Agreements from competing for certain **USI clients**. The law also prevented the

48

Producers from conspiring with Lockton to steal USI's business, staff, and information while the Producers were still working for ***and being paid by*** USI.[15]

Unfortunately, the district court used the same logic the *Bailey* court rejected. In *Bailey I* and *II,* the Florida appellate court adopted, in part, the decision of this Court in *Pidcock v. Sunnyland Am., Inc.*, 854 F.2d 443, 446 (11th Cir. 1988). The Florida court relied on *Pidcock* for the proposition that ***any and all*** profit earned by the defendant is presumed to be the proximate consequence of the defendant's improper conduct. *Bailey I*, 196 So. 3d at 378. In *Pidcock*, this Court articulated some limiting principles, explaining for example that the defendant may produce evidence rebutting the presumption of causation and demonstrating a break in the causal chain between the improper conduct and the profits. The Florida court, however, rejected the limiting principles set forth in *Pidcock.* Accordingly, the court in *Bailey II* directed the trial court to enter a disgorgement award equal to every dollar of profit earned by the *Bailey* defendants after the date of their improper

---

[15] If there were any extraordinary skills that Appellees might argue were value they could keep, they could have explored it through cross-examination (assuming it did not violate the rule in *Bailey*). In other words, at best, Appellees were entitled to test this on cross-examination (for instance, challenging USI's expert regarding the appropriateness of the multiple applied to EBITDA, perhaps), not an exclusion of the model in toto.

conduct, plus the entire value of the business allegedly stolen.[16]  The court in *Bailey II* held that the defendants' business value and profits were subject to disgorgement regardless of whether the value and profits were based in part on the skills of the wrongdoers. The court also held that any evidence seeking to demonstrate the victim's inability to achieve the same value and profits was improper. *Bailey II*, 268 So. 3d at 200-02; *see also Bailey I*, 196 So. 3d at 378-79;  *Pidcock v. Sunnyland Am., Inc.,* 854 F.2d 443, 446 (11th Cir. 1988) (relied on in *Bailey I & II*; defrauding purchaser owed defrauded seller the profit gained by the fraud, even if the appraised profit was due to the skill of the wrongdoer—defrauded party should get benefit of any windfalls as opposed to the fraudster keeping them).

Having taken the wrong turn in USI's case, the district court struck USI's expert's valuation showing the wrongdoers' gain from the steal was at least $15-$19 million based on the value of the property taken minus what was paid (zero). The court also denied USI's discovery requests seeking the total value and profit projections by Lockton and the Producers, ruling those projections were privileged.

This, again was error. USI's fair market model was the proper damage methodology under Florida law, as it measured what Lockton and the Producers

---

[16] Although USI would have been entitled to all profits to be gained by the steal along with Lockton's internal valuation of the stolen business, the district court would not allow USI to obtain that information, ruling that it was privileged.  That ruling was error in light of *Bailey I & II*, because those amounts were subject to a remedy restoring to USI what was stolen.

gained from their tortious conduct. It is also what Lockton would have paid had it acquired USI's business legally.[17] In short, the fair valuation model would have restored USI to the position it would have been in had the wrongdoers paid for USI's business instead of stealing it. *Phillips Chem. Co.*, 440 So. 2d at 1295 (wrongdoers who stole from plaintiff's business must pay plaintiff what should and would have been paid to and received by plaintiff but for the wrongdoing).

Because the district court refused the damage model authorized under Florida law, USI was forced to proceed with a lost-profit model that assumed a certain retention rate of clients in the absence of wrongdoing. This, again, was countered by the wrongdoers with testimony that due to their skills, USI would have lost all or most of the clients anyway. Thus, the jury was allowed to reduce USI's damages based on the skills of Lockton and the Producers. This, as we just explained, was error. *Bailey II*, 268 So. 3d at 200-02 (using evidence of victim's lack of ability as a reason to reduce damages is improper); *see also Bailey I*, 196 So. 3d at 378-79; *Pidcock*, 854 F.2d at 446 (11th Cir. 1988).

Even worse, the lost-profit model did not come close to reflecting the true value of the business stolen. *See, e.g.*, *Mercer Health & Benefits LLC, v. DiGregorio*,

---

[17]    Because restrictive covenant agreements, like those at issue here, are industry standard, an acquisition is the typical manner to immediately acquire business and talent while respecting the contractual agreements between parties and to fairly compensate for that business and talent, including the waiver of restrictions.

307 F. Supp. 3d 326, 335–36 (S.D.N.Y 2018) ("Further, Marrero [of Lockton] told [target producer] that it was "cheaper" for Lockton to pay attorneys' fees for new employees because Lockton gains new clients from hiring a competitor's employees. Marrero referred to other employees that Lockton Southeast had recruited from other competitors."). Therefore, under the slap-on-the-wrist damage model required by the district court, the wrongdoers paid less by stealing USI's property as opposed to paying fair valuation. That result is forbidden under Florida law and only serves to embolden an industry bad actor.

The result is also contrary to public policy. The fair market valuation model (USI's rejected model) serves "at least two important public policies. First, the victim [is] fully compensated; second, the threat of [having to pay fair valuation] should deter others" from colluding with employees of a competitor in order to steal the competitor's business. *Mortellite v. Am. Tower, L.P.*, 819 So. 2d 928, 932 (Fla. Dist. Ct. App. 2002) (Casanueva, J., concurring) (receded from on other grounds in *Githler v. Grande*, 289 So. 3d 533, 535 (Fla. Dist. Ct. App. 2019); *see also Guyana Tel. & Tel. Co., Ltd. v. Melbourne Int'l Comms., Ltd.,* 329 F. 3d 1241, 1249 (11th Cir. 2003) (applying Florida law; "Restitution is a remedy that is often available to victims of a wrong. Restitution measures a plaintiff's recovery according to the defendant's, rather than the plaintiff's, rightful position . . . . In cases of wrongful enrichment, a plaintiff whose goods or services were obtained by a conscious

wrongdoer generally has two available remedies: compensatory damages or restitution. When the plaintiff elects restitution, the plaintiff can either recover the goods themselves or the fair market value of the transferred goods and services.").

In *Bailey II*, the Florida court adopted the following explanation from the Restatement (Third) of Restitution and Unjust Enrichment:

> If A anticipates (accurately) that unauthorized interference with B's entitlement may yield profits exceeding any damages B could prove, A has a dangerous incentive to take without asking... .

*Bailey II*, 268 So. 2d at 201 (citing Restatement (Third) of Restitution and Unjust Enrichment § 3. The purpose of disgorgement is to prevent that result. Here, Lockton and the Producers decided that the profits they would enjoy by their tortious conduct would vastly exceed any losses USI would suffer. Accordingly, Lockton and the Producers made the calculated decision to "take without asking." This is exactly the conduct the law is designed to remedy.

Below, the wrongdoers argued USI was not entitled to the value of the business stolen because that remedy applied only when a business is destroyed. They further argued that where the business is not destroyed, the proper measure of damage is lost profits. The district court correctly rejected that argument because USI was not seeking the value of its entire business; instead its value model was limited to what was "obtained by a conscious wrongdoer." *Guyana*, 329 F. 3d at 1249. Thus, because USI was seeking the value of the business "lost to Lockton,"

the district court held the lost-profit cases did not apply to the business-stolen "scenario" in this case (Doc. 178 at 12-13). And yet the court, faced with the choice between the value of what was stolen versus a lost-profit model that did not apply, limited USI to the lost-profit model anyway (*Id.* At 12-22).

In short, the district court erred in handcuffing USI on its damage presentation, refusing to allow the damage model required under Florida law. This resulted in a damage theory that did not and could not restore to USI the fair valuation of what was stolen. A new damage trial is required.[18]

### The District Court Erred in Refusing to Allow the Jury to Determine the Issue of Punitive Damages

The district court essentially directed a verdict against USI on its claim for punitive damages against Lockton and the Producers. The standard of review is properly set forth in *Hasenfus v. Secord*, 962 F.2d 1556, 1559 (11th Cir. 1992):

> This court reviews *de novo* the district court's entry of a directed verdict. The district court should grant a motion for directed verdict if "the facts and inferences point overwhelmingly in favor of one party such that reasonable people could not arrive at a contrary verdict." *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). The court must consider "all the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Carter*, 870 F.2d at 581. We may not affirm the district court's entry of a directed verdict if the record contains "substantial evidence" opposing the motion. *Carter*, 870 F.2d

---

[18] The wrongdoers argued that USI was not entitled to the value of the business stolen because that remedy applies only when a business is destroyed. The district court correctly rejected that argument because USI was not seeking the value of its entire business; instead its value model was limited to what was "obtained by a conscious wrongdoer." *Guyana*, 329 F. 3d at 1249.

at 581. "A mere scintilla of evidence," however, is not sufficient to defeat the motion. *Carter*, 870 F.2d at 581; *see also Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc).

Under the authority of *Bailey I & II* and *Werner Enters., Inc. v. Mendez*, 362 So. 3d 278 (Fla. Dist. Ct. App. 2023), the district court erred in refusing to allow the jury to consider the issue of punitive damages as to Lockton and the Producers. As the above-cited cases make clear, when parties intentionally scheme to breach covenants and fiduciary duties in order to steal property from a business, the fact-finder must be allowed to consider the issue of punitive damages.

 Here, as made obvious by its ruling on USI's post-trial motion, the district court usurped the function of the jury. Indeed, the district court noted that it was because, in part, of the "uncertainties as to how far businesses in Lockton's position may go without stepping over the line from permissible to tortious conduct" that the court made findings exclusively for the jury. (Doc. 354 at 20). Disposing of such uncertainties (relevant to the clear and convincing element) is squarely within the province of the *fact-finder*—here, the jury. Below, the court itself "found" the evidence against the wrongdoers was not clear and convincing.  But any "finding" as to punitive damages was for the jury, not the court.

In only the course of an afternoon, the jury found against the wrongdoers on every single count: breach of contract, breach of fiduciary duty, aiding and abetting breaches of fiduciary duties, and intentional tortious interference. As a matter of law

and given these claims, it was for the jury to determine whether punitive damages were warranted by clear and convincing evidence. *Id.* Thus, it was error for the court to substitute itself as the fact-finder. Accordingly, on remand for a new damages trial, the issue of punitive damages must be submitted to the jury. *Id.*[19]

---

[19]At the heart of USI's tortious interference claim was the determination of whether Lockton's and the Producers' actions were in observance of the "rules of combat," were "unfair according to contemporaneous business standards," or were "sanctioned by the rules of the game." *See, e.g., Bluesky Greenland Environmental Solutions, LLC v. 21st Century Planet Fund, LLC,* 985 F. Supp. 2d 1356, 1367 (S.D. Fla. 2013) ("'Improper means'" requires a determination as to whether the conduct was 'sanctioned by the rules of the game' and what is 'right and just under the circumstances.'); *see also Mfg. Research Corp. v. Greenlee Tool Co.,* 693 F.2d 1037, 1040 (11th Cir. 1982) (("[W]hen there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question."); *Azar v. Lehigh Corp.,* 364 So. 2d 860, 862 (Fla. Dist. Ct. App.1978) ("Though trade warfare may be waged to the bitter end, there are certain rules of combat which must be observed.").     That Lockton pursued a similar course of action with similar consequences demonstrated that Lockton's theft (aided by the Producers) was intentional. It was also unacceptable in the industry and in any civilized society.  And it most assuredly was not "in compliance with the rules of combat." (Doc. 200). Evidence that Lockton and the Producers knew their conduct would cause, drawn from the many times Lockton had done the same thing to other businesses, is not prohibited by Rule 404(b).  And yet the district court prohibited any such evidence. *See, e.g., ADT LLC v. Alder Holdings, LLC,* No. 9:17-CV-81237-ROSENBERG, 2019 WL 13211550, at *1 (S.D. Fla. Apr. 29, 2019) (adopting Report & Recommendation overruling objections to evidence of complaints and settlements and noting, "[E]vidence of other lawsuits and investigations . . . are admissible to show Defendants' knowledge and notice.").  The prior acts of wrongdoing were relevant to intent and notice of the likely injury and should be admissible on remand, at least as to the issue of punitive damages.

## **CONCLUSION**

For the reasons stated and upon the authorities cited, the district court's denial

of USI's motion for a new trial on damages and punitive damages should be reversed

and the case remanded for a retrial on those issues only.

Dated: October 2, 2025                    Respectfully submitted,

**HOLLAND & KNIGHT LLP**              **HOLLAND & KNIGHT LLP**
Matthew Zimmerman                      Christopher N. Bellows
Florida Bar No. 011484                 Florida Bar No. 512745
matthew.zimmerman@hklaw.com            christopher.bellows@hklaw.com
777 South Flagler Dr.                  701 Brickell Avenue, Suite 3300
Suite 1900-West                        Miami, FL 33131
West Palm Beach, FL 33401-6148         Tel: (305) 374-8500
Tel: (561) 833-2000

                                       By: */s/ Christopher Bellows*
                                            Christopher N. Bellows

**HOLLAND & KNIGHT LLP**
David E. Cannella
Florida Bar No. 983837
david.cannella@hklaw.com
200 South Orange Ave., Suite 2600
Orlando, FL 32801
Tel: (407) 244-1165

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, this document contains 11,988 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Christopher Bellows*
Christopher N. Bellows

58

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on this 2nd day of October, 2025, I electronically filed the foregoing with the Clerk of Court using the Eleventh Circuit CM/ECF system, which will send notification of filing to all parties of record. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

*/s/ Christopher Bellows*
Christopher N. Bellows